**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARVIN SHOFFNER,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 25-CV-2059** |
| | : | |
| **DR. GLUSHAKOW, *et al.*,** | : | |
| **Defendants.** | : | |

# MEMORANDUM

**KENNEY, J.** **AUGUST 27, 2026**

Plaintiff Marvin Shoffner, an inmate at SCI Coal Township, filed a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that various prison officials and medical personnel associated with SCI Phoenix denied him mental healthcare while he was housed there. Five of the Defendants have moved to dismiss Shoffner's claims against them: Dr. Glushakow, CRNP Floyd, CRNP Clark, Superintendent Joseph Terra, and SCI Phoenix.[1] For the reasons that follow, the Court will dismiss the claims against SCI Phoenix, as well as the retaliation claims against Floyd and Clark, and otherwise deny the Motions.

## I. FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY[2]

Shoffner has been suffering from mental illness since he first entered the Pennsylvania Department of Corrections ("DOC"), receiving the "stability Code-D" at that time. (Am. Compl. ¶ 38.) Shoffner claims that while at SCI Phoenix, he repeatedly warned staff about his suicidal

[1] In addition to these Defendants, twenty-eight other Defendants named in the Amended Complaint have filed Answers. (*See* ECF Nos. 27, 43, 74, 87.)

[2] Unless otherwise noted, the factual allegations are taken from the Amended Complaint, including the exhibits attached thereto (ECF No. 21). The Court adopts the sequential pagination supplied by the CM/ECF docketing system. The Court will recount only those allegations that are relevant for resolving the pending motions to dismiss.

thoughts, but his concerns were met with only harassment, threats, and a refusal to intervene to prevent his self-harm. He specifically wrote to Dr. Glushakow about his mental health deteriorating, but the Doctor ignored his concerns. (*Id.* ¶ 48.) Defendants ignored Shoffner's pleas, allowing him to engage in acts of self-harm, including suicide attempts.

On August 4, 2023, while housed at the restricted housing unit ("RHU"), Shoffner shared with correctional officers that he was having suicidal and homicidal ideations. (*Id.* ¶¶ 44, 45.) Sergent Rivera slammed the meal slot closed on Shoffner's arm, injuring him, and stated, "go kill yourself." (*Id.* ¶ 45.) Shoffner then began to bang his head and fist violently, which caused him to be transferred to a Psychiatric Observation Cell ("POC"). (*Id.* ¶ 46.) On August 18, 2023, Shoffner again shared that he was having suicidal and homicidal ideations and "needed to go to [a] POC." (*Id.* ¶ 49.) Rivera responded while laughing, "everyone is, go draw a picture." (*Id.*) Shoffner then proceeded to cut himself with a razor. (*Id.* ¶ 50.) Six corrections officers responded by proceeding to "slam, punch, kick, and choke" Shoffner, causing him injuries for which they denied him any medical treatment. (*Id.*) On August 29, 2023, Shoffner "informed Clark" and P.S.S. Hydro that he was suicidal, but his concerns "went ignored." (*Id.* ¶ 51.)

After Shoffner pursued grievances about his "continuing mental health deterioration," corrections officers called him a "rat" and "homosexual/gay" in front of inmates, causing Shoffner to suffer harassment and threats from the inmates. (*Id.* ¶ 54.) Dr. Glushakow stated that Shoffner would "have to be near death" before Dr. Glushakow would order him back to a POC or provide other treatment. (*Id.*) When Shoffner was placed in a POC, he would return to find his property "all gone," including legal papers, grievances, and grievance responses. (*Id.* ¶ 55.) His cell was searched on October 12, 2023, in retaliation for filing grievances "and seeking litigation," and during the search, all of his legal work, including his grievances, was confiscated. (*Id.* ¶ 56.)

On October 26, 2023, Shoffner "attempted suicide via [a] handmade noose" in front of three corrections officers, one of whom stated, "just hang yourself already because I can't just run through the door." (*Id.* ¶ 57.) Shoffner again attempted suicide on October 30, 2023, and "received no response." (*Id.* ¶ 59.) Shoffner pleaded with Dr. Glushakow to place him on the Diversionary Treatment Unit ("DTU"), where he could have more access to mental health services and more supervision due to his tendencies towards self-harm. (*Id.* ¶ 60.) Glushakow denied Shoffner's request, stating that he believed Shoffner was "faking, wanting attention, and trying to manipulate the system for a secondary gain." (*Id.*) Glushakow also stated that due to Shoffner's filing of "false grievances," he will make sure that Shoffner never goes to the DTU. (*Id.*)

In December, he was left in a cell with a razor and pleaded with the guards to take the razor away because he had been "extremely suicidal" for the last couple of days. (*Id.* ¶¶ 68–69.) Shoffner also showed guards suicide notes. (*Id.* ¶ 70.) Despite this, Shoffner was left in his cell for 16 hours without a wellness check. (*Id.* ¶ 71.) Shoffner was found "bleeding out from severe lacerations to [his] arm," which required 50 sutures. (*Id.* ¶ 74.) In response, Dr. Glushakow "out of anger, frustration, and ill-intent" directed that Shoffner be placed "into a grind up cell" for six days, where it is cold, there is no mattress or suicide blanket, or reading material. (*Id.* ¶ 75.) Shoffner states that Terra and SCI Phoenix allegedly "encouraged" the covering up of prison staff misconduct by "loosely enforcing policy and inadequately screening, training, supervising, and disciplining employees." (*Id.* at ¶ 43.) He also alleges that Terra and Dr. Glushakow were "aware" that the corrections officers in the level 5 housing unit were "cutting corners when enforcing the security . . . by not checking inmates' razors" and "conducting careless inadequate security/wellness rounds," which resulted in Shoffner's injuries. (*Id.* ¶ 72.)

Another incident occurred in January of 2024. Shoffner spoke to CRNP Floyd in his cell on January 22, 2024, and expressed to her that he "was extremely suicidal and having difficulty managing his anxiety and depression." (*Id.* ¶ 85.) CRNP Floyd allegedly "falsified" Shoffner's records by stating that he denied suicidal ideations. (*Id.*) The next day, Shoffner was found "hanging in a cell from [a] noose" and was taken to the hospital. (*Id.* ¶ 88.) When Shoffner returned from the hospital, Dr. Glushakow punished him for his acts of self-harm and ordered him to a POC unit where he was denied soap, toothpaste, toothbrush, toilet paper, clothing, reading material, shower, and running water for over nine consecutive days. (*Id.* ¶ 89.)

Based on these allegations, Shoffner asserts Eighth Amendment deliberate indifference claims and First Amendment retaliation claims against Defendants. He seeks money damages. (*Id.* ¶¶ 119–20.) The Court previously granted Shoffner leave to proceed *in forma pauperis* and directed service of his Complaint. (ECF No. 6.) After Glushakow moved to dismiss the Complaint, Shoffner filed an Amended Complaint. (ECF No. 21.) Glushakow filed a Motion to Dismiss the Amended Complaint (ECF No. 28), to which Shoffner filed a Response (ECF No. 78) and Glushakow filed a Reply (ECF No. 85). Floyd also filed a Motion to Dismiss the Amended Complaint (ECF No. 38) to which Shoffner filed a Response (ECF No. 49). Clark also filed a Motion to Dismiss the Amended Complaint (ECF No. 70), to which Shoffner filed a Response (ECF No. 81) and Clark filed a Reply (ECF No. 85). Finally, SCI Phoenix and Superintendent Joseph Terra filed a Motion to Dismiss the Amended Complaint (ECF No. 41), to which Shoffner filed a Response (ECF No. 82).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. "A 12(b)(6) motion

tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). It is the defendants' burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (same). To determine whether a complaint filed by a *pro se* litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (citation modified), *abrogation on other grounds*

*recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).

Dismissal of a complaint based on an affirmative defense, such as a failure to exhaust or based on the statute of limitations, is only appropriate at the pleading stage when the "defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). "[W]hile a court may entertain a motion to dismiss on [affirmative defenses], it may not allocate . . . [burdens] . . . in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." *Skolas*, 770 F.3d at 251 (internal citation omitted). Rather, the burden of pleading and proving an affirmative defense is borne by the defendant. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997).

## III. DISCUSSION

The vehicle by which federal constitutional claims may be brought in federal court is an action under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). In a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, and, therefore, a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).

### A. Dr. Glushakow, CRNP Floyd, and CRNP Clark's Motions to Dismiss

Glushakow, Floyd, and Clark argue that the claims asserted against them should be dismissed because Shoffner did not properly exhaust his claims against them. (ECF No. 28 at 10–13; ECF No. 38 at 7–8; ECF No. 70 at 6–10.) Glushakow, Floyd, and Clark also argue that

Shoffner failed to state a plausible constitutional claim against them.

**1. Exhaustion**

Glushakow, Floyd, and Clark first argue that Shoffner failed to exhaust available administrative remedies. Prisoners seeking to challenge the conditions of their confinement are subject to the Prison Litigation Reform Act ("PLRA"), which mandates exhaustion of all available administrative remedies before bringing a lawsuit. 42 U.S.C. § 1997e(a). Exhaustion is a non-jurisdictional "standard affirmative defense." *Perttu v. Richards*, 605 U.S. 460, 469 (2025). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Prater v. Dep't of Corr.*, 76 F.4th 184, 203 (3d Cir. 2023) (stating that courts "determine whether a prisoner has properly exhausted a claim by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances" (internal quotations omitted)). These procedural rules are supplied by individual prisons. *See, e.g.*, *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Smith v. Sec'y of Pa. Dep't of Corr.*, 747 F. App'x 101, 103 (3d Cir. 2018) (*per curiam*) (stating that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of the grievance system at his institution).

"There is one exception to the mandatory exhaustion requirement: administrative remedies must be available to the prisoner." *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Ross v. Blake*, 578 U.S. 632 (2016)). "An administrative remedy is unavailable when it 'operates as a simple dead-end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id.* (quoting *Shifflett v. Korszniak*, 934

F.3d 356, 365 (3d Cir. 2019)); *see also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020). Claims that are not properly exhausted under the PLRA are procedurally defaulted. *See Woodford*, 548 U.S. at 92–93; *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004). "[W]here a defendant moves to dismiss based on a failure-to-exhaust defense and the exhaustion issue turns on indisputably authentic documents related to the inmate's grievances, [a court] may consider those documents without converting a motion to dismiss to a motion for summary judgment."[3] *Rinaldi v. United States*, 904 F.3d 257, 261 n.1 (3d Cir. 2018); *Spruill*, 372 F.3d at 223.

The DOC's general grievance process is set forth in policy number DC-ADM 804, which sets forth a three-step process for review of inmate grievances.[4] An inmate must initially submit a written grievance within fifteen working days after the event upon which the grievance is based. DC-ADM 804, § 1.A(5), (8). The grievance is then "reviewed and results in an Initial Review Response or Rejection explaining the disposition of the inmate's grievance." *Moore v. Lamas*, No. 22-1007, 2023 WL 371397, at *2 (3d Cir. Jan. 24, 2023) (footnote omitted). The inmate then has fifteen days to file an appeal with the Facility Manager. DC-ADM 804, § 2.A. "Upon the Facility Manager's resolution of that appeal, the inmate may file for Final Review by . . . SOIGA." *Moore*, 2023 WL 371397, at *2 (citing DC-ADM 804, § 2.B). ADM 804 "is the exclusive means of exhaustion," so failure to "follow the full administrative review process under ADM 804"

---

[3] Counsel for Glushakow served a subpoena on the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), requesting full and complete copies of any and all grievances received by that office pertaining to Shoffner. (*See* ECF No. 28 at 11.) The documents produced by SOIGA are attached to each of the Glushakow's, Floyd's, and Clark's Motions to Dismiss as an exhibit. SOIGA produced twelve of Plaintiff's grievances, which it processed during the operative time period.

[4] DC-ADM 804 is attached as Exhibit A to Glushakow, Floyd, and Clark's Motions to Dismiss. It is also available at https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf (last visited Aug. 27, 2026).

results in a failure to exhaust under the PLRA. *Prater*, 76 F.4th at 204.

Glushakow, Floyd, and Clark represent that SOIGA produced twelve grievances filed by Shoffner and that only three of those produced (Grievance Nos. 1068098, 1068100, and 1066864) completed SOIGA's appeal process on the merits. According to Glushakow, Floyd, and Clark, the three completed grievances are the only three that were properly exhausted. They contend that because the completed grievances do not mention them by name, title, or role, Shoffner has failed to properly exhaust his claims against them. Moreover, of the nine other grievances filed by Shoffner that did not complete the appeal process, none refer to Floyd or Clark, and only one refers to Glushakow. (*See* ECF No. 28-4 at 48 (Ex. D, Grievance No. 1068104).) In the grievance that refers to Glushakow, Shoffner states that "Dr. G. order[ed] me into a P.O.C. with nothing but a smock after I just attempted to kill myself and had fresh stitches in my arm." (*Id.*) Shoffner's appeal to final review for this grievance was dismissed because he allegedly failed to "provide any points or reasons why [he was] appealing any of the information provided within the initial review response or Facility Manager's response." (*Id.* at 45–46.)

Shoffner does not dispute that he did not complete the appeals process with respect to the nine other grievances. Nor does he dispute that the three that were properly exhausted do not mention Glushakow, Clark, or Floyd. Rather, he contends that he was subjected to "retaliatory behaviors from corrections officers and staff including defendants," due to filing grievances, which rendered the grievance procedures unavailable to him.[5] (ECF No. 78 at 10.) He states that he

[5] Shoffner asserts other arguments as to why the grievance process was unavailable, such as that corrections officers "thwarted" his attempts to file grievances and that he did not receive grievance responses despite "several DC-135A request[s] to staff to the grievance coordinator seeking copies, updates, [and] notifications." (*See* ECF No. 78 at 10–12.) The Court need not address these arguments because it concludes that Shoffner has raised sufficient factual questions concerning the availability of administrative remedies as a result of Defendants' intimidation tactics. However, the Court notes that when prison officials refuse to provide grievance forms in

became "extremely fearful for his life" due to prison staff "intimidating him from continuing the grievance process." (ECF No. 78 at 12.) As noted above, intimidation and retaliation tactics that thwart an inmate's attempts to make use of the grievance procedures can render an administrative remedy "unavailable." *Downey*, 968 F.3d at 305; *see also Rinaldi*, 904 F.3d at 267 ("[A]dministrative remedies are not 'available' under the PLRA where a prison official inhibits an inmate from resorting to them through serious threats of retaliation and bodily harm."). "To prove intimidation, an inmate must show (1) that 'the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process,' and (2) that 'the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust.'" *Jackson v. Carter*, 813 F. App'x 820, 824 (3d Cir. 2020) (*per curiam*) (quoting *Rinaldi*, 904 F.3d at 268); *see also Rinaldi*, 904 F.3d at 268–69 (explaining that determining whether unavailability based on intimidation is met requires assessment of both an "objective component" and a "subjective component").

The Amended Complaint is replete with examples of Shoffner being retaliated against and intimidated in response to his filing grievances. For example, corrections officers called him a "rat" and "homosexual/gay" in front of inmates, causing Shoffner to suffer harassment and threats from the inmates. (Am. Compl. ¶ 54.) Corrections officers also refused to provide him meals, fed him contaminated food, denied him time in the yard, harassed him, threatened to kill him, and punched him in the face, knocking him unconscious. (*Id.* ¶¶ 91–98.) On one occasion a corrections

response to inmate requests, administrative remedies may be rendered unavailable. *See Carter v. Thomas*, No. 12-1955, 2014 WL 4792600, at *9 (M.D. Pa. Sept. 23, 2014) (citing *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) (reversing dismissal on exhaustion grounds where prisoner alleged the prison officials refused to provide necessary grievance forms)).

officer "slid a sharp piece of metal" into Shoffner's cell and told him to "do us all a favor [and] just kill yourself already." (*Id.* ¶ 98.) "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." *Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d Cir. 2013) (citations omitted). Here, Shoffner has raised sufficient factual questions concerning the availability of administrative remedies such that it is not appropriate for the Court to dismiss his claims at this time. *See Washington v. Link*, 750 F. App'x 84, 88 (3d Cir. 2018) (*per curiam*) (disapproving of the district court's fact-finding on exhaustion at the 12(b)(6) stage). At a minimum, it is not sufficiently clear that he did not exhaust *available* administrative remedies.

Defendants contend that this exhaustion unavailability exception does not apply to Shoffner's claims because Shoffner continued to file grievances throughout the period of time encompassed by his Amended Complaint. The Court understands Defendants to argue that Shoffner's continued filing of grievances somehow negates his subjective fear of filing grievances due to the intimidation tactics. However, in ruling on a Rule 12(b) motion, the Court must accept plausible allegations made by the plaintiff. *See Shorter*, 12 F.4th at 174. Shoffner has plausibly raised issues concerning the availability of remedies as a result of being subjected to retaliatory conduct from prison staff. And, because of the factual issues at hand, it would be premature to conclusively rule on the issue. *See Washington*, 750 F. App'x at 88. Accordingly, the Court will deny the Motions to Dismiss the Amended Complaint filed by Glushakow, Floyd, and Clark on grounds that Shoffner failed to exhaust administrative remedies.

**2. Failure to State a Claim**

Glushakow, Floyd, and Clark also argue that the claims asserted against them should be dismissed because Shoffner has failed to state plausible Eighth Amendment and First Amendment

retaliation claims against them. To state a claim based on the failure to provide medical care, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety." *Id*. at 837. Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference claims can be based on the failure to provide adequate mental health services. *DeJesus v. Delaware through Del. Dep't of Corr*., 833 F. App'x 936, 940 (3d Cir. 2020) (citing *Palakovic v. Wetzel*, 854 F.3d 209, 227–29, 231–32 (3d Cir. 2017)); *see also Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979) (deliberate indifference is actionable "when inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals").

Shoffner at times characterizes his Eighth Amendment claims to involve "defendants knowledge of his mental health instability and suicide risk but fail[ure] to protect [Shoffner] from himself." (Am. Compl. ¶ 105.) To hold a defendant liable in such cases, a plaintiff must show: "(1) that the individual had a particular vulnerability to suicide, meaning that there was a 'strong likelihood, rather than a mere possibility,' that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the

official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability." *Palakovic*, 854 F.3d at 223–24 (footnote omitted); *see also DeJesus*, 833 F. App'x at 940 (noting that a claim for deliberate indifference to serious medical need is distinct from "a vulnerability to suicide claim[, which] focuses more narrowly on evidence showing a strong likelihood of suicide" (citing *Palakovic*, 854 F.3d at 223–24, 227)); *Joines v. Twp. of Ridley*, 229 F. App'x 161, 162 (3d Cir. 2007) (applying "particular vulnerability to suicide" rubric to attempted suicide). When assessing an inmate's particular vulnerability, the "strong likelihood" that an inmate will harm herself must be "so obvious that a lay person would easily recognize the necessity for preventative action." *Bingham v. Lancaster Cnty.*, 709 F. Supp. 3d 176, 185 (E.D. Pa. 2024) (internal quotation marks omitted). The Court considers whether an inmate exhibited a particular vulnerability to suicide on the "totality of the facts presented." *Id.* (quoting *Palakovic*, 854 F.3d at 230).

To state a plausible First Amendment retaliation claim, "a prisoner must allege that: (1) he was engaged in constitutionally protected conduct, (2) he suffered some adverse action at the hands of prison officials, and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that action." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (internal quotation marks omitted)). As to the first element, a prisoner's filing of a lawsuit, grievance, or other complaint, or even expressing an intent to do so to prison authorities, is constitutionally protected conduct. *See Watson v. Rozum*, 834 F.3d 417, 422–23 (3d Cir. 2016). As to the second element, an adverse action "is one sufficient to deter a person of ordinary firmness from exercising his First Amendment rights," and "need not be great in order to be actionable; rather, it need only be more than *de minimis*." *Id.* at 422 n.6, 423 (citation modified). To satisfy the third element, a prisoner

must allege a causal link between the specific protected activity and the adverse action. *See, e.g.*, *Hammonds v. Headman*, 645 F. App'x 149, 152 (3d Cir. 2016) (*per curiam*) ("[B]ecause Hammonds' conclusory allegations fail to raise the required inference of a causal link between his grievance and the filing of misconduct reports, he failed to state a retaliation claim."). The timing of the allegedly retaliatory behavior relative to the constitutionally protected conduct may establish a causal link between the two for purposes of establishing motivation. *See Watson*, 834 F.3d at 422; *see also Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017).

Shoffner alleges that he wrote several DC-135A requests to Glushakow about his deteriorating mental health, but that his concerns were ignored. (Am. Compl. ¶ 48.) He further alleges that after he made at least two suicide attempts, he requested that Glushakow place him in the Diversionary Treatment Unit, where he could access mental health services, but that Glushakow denied the request due to Shoffner filing grievances and stated that he would make sure Shoffner never went to DTU. (*Id.* ¶ 60.) In December of 2023, "out of anger [and] frustration" Glushakow ordered Shoffner to be placed in a "grind up cell where it's colder than average with no mattress, suicide blanket, or reading material for 6 consecutive days." (*Id.* ¶ 75.) Glushakow allegedly stated to Shoffner: "you can keep harming yourself all you want I [am] not buying it and my co-workers are ordered not to entertain your foolishness." (*Id.*) Finally, Shoffner alleges that after he attempted suicide, Dr. Glushakow punished him for his self-harm but ordered him to a POC unit where he was denied soap, toothpaste, and all cleaning products. (*Id.* ¶ 89.) Based on these allegations, the Court concludes that Shoffner plausibly alleges that Glushakow acted with deliberate indifference to his serious mental health needs and to his particular vulnerability to suicide. Shoffner also plausibly alleges that Glushakow retaliated against him for filing grievances. Accordingly, the Court will deny Glushakow's Motion to Dismiss the Amended

Complaint.

As to Defendants Floyd and Clark, while there are fewer specific allegations of their involvement, the allegations taken as a whole support a plausible inference of deliberate indifference on their part. Shoffner states that on August 29, 2023, he "informed Clark and [Defendant] Hydro that he was suicidal and homicidal, which went ignored." (*Id.* ¶ 51.) Shoffner attempted suicide less than two months later. (*Id.* ¶ 57.) As to Floyd, Shoffner alleges that on January 22, 2024, he spoke to Floyd "cellside" and advised her that he was "extremely suicidal and having difficulty managing his anxiety and depression." (*Id.* ¶ 85.) He further alleges that Floyd "falsified [his] records by stating [that he] denied suicidal ideation." (*Id.*) The next day Shoffner attempted suicide again. (*Id.* ¶ 88.)

In support of dismissal, Clark and Floyd both argue that prison officials are "accorded considerable latitude in the diagnosis and treatment of prisoners," (ECF No. 70 at 11–12 (quoting *Joh v. Suhey*, 709 F. App'x 729, 731 (3d Cir. 2017) (*per curiam*)); ECF No. 38 at 9), and that at worst, their disregard of Shoffner's report of suicidality amounted to negligence or a difference of opinion, which is insufficient to state a claim. However, Shoffner does not contend that Clark and Floyd mistreated his mental health conditions but rather that they completely ignored them, including his admission that he was suicidal. Moreover, Clark and Floyd do not address Shoffner's claim that they acted with reckless or deliberate indifference to his vulnerability to suicide. Shoffner's allegations also support a plausible vulnerability to suicide claim. Shoffner alleges that he had a Stability Code-D when he arrived at the DOC. Moreover, he alleges that since August of 2022, he had been seen by psychiatry over 24 times, seen by psychology over eight times, and had been detained in a POC cell at least nine times. (*Id.* ¶ 40.) He further alleges that all defendants "had knowledge of his mental health instability and suicide risk factor but failed to protect him

from himself," (*id.* ¶ 105), and has described relevant interactions with these Defendants about his mental health and concerns about suicidality. These allegations taken together support a plausible inference that nurses Floyd and Clark knew or should have known about Shoffner's vulnerability to suicide. *See Palakovic*, 854 F.3d at 216, 230–31 (finding "Stability Rating D" designation—"the lowest stability rating given a prisoner in the [DOC] system"—and the fact the plaintiff had expressed a wish to die in concluding that plaintiff plausibly alleged a vulnerability to suicide claim). Accordingly, the Court will deny Floyd and Clark's Motions to Dismiss the Eighth Amendment claims.

Turning to Shoffner's retaliation claims, Shoffner has alleged sufficient facts to proceed on his retaliation claim against Dr. Glushakow given his allegation that he threatened to withhold treatment "due to [Shoffner] filing grievances." (Am. Compl. ¶ 60; ECF No. 78 at 8.); *see Thomas v. Brinich*, No. 12-1539, 2014 WL 956983, at *5 (M.D. Pa. Mar. 12, 2014), *aff'd*, 579 F. App'x 60 (3d Cir. 2014) ("A delay in providing, or denial of, medical treatment constitutes adverse action for purposes of a retaliation claim."); *Cortlessa v. Cnty. of Chester*, No. 04-1039, 2005 WL 2789178, at *7 (E.D. Pa. Oct. 26, 2005) (holding that plaintiff stated a plausible claim for inadequate medical treatment retaliation). The allegations do not, however, support a plausible First Amendment retaliation claim against either Floyd or Clark. There are no allegations that either nurse failed to act on his claim of suicidality or engaged in any other conduct that could be deemed retaliatory against Shoffner. Accordingly, Clark and Floyd's Motions will be granted as to the First Amendment retaliation claims.

### B. Terra's Motion to Dismiss

Defendants also seek dismissal of all claims against Superintendent Terra. Defendants argue that Shoffner has failed to allege that Terra was personally involved in any of the alleged

constitutional harm. Supervisors like Terra can only be found liable for the unconstitutional acts undertaken by their subordinates in two scenarios. First, a supervisor may be liable if he or she, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom, which directly caused [the] constitutional harm." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* "Failure to" claims, such as a failure to train, failure to discipline, or failure to supervise, are generally considered a subcategory of policy or practice liability. *Id.* at 316–17.

Shoffner first alleges in conclusory fashion that Terra "loosely enforce[ed] policy" and failed to adequately screen, train, supervise, or discipline prison employees. (Am. Compl. ¶ 43.) Such conclusory allegations are not sufficient to state a plausible claim. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 132 (3d Cir. 2010) ("As mere restatements of the elements of [his] supervisory liability claims, they are not entitled to the assumption of truth."). However, Shoffner also alleges that Terra was "aware" that corrections officers in the level 5 housing area were "cutting corners when enforcing security policy" by not checking inmates' razors for "tampering" and by "conducting careless security/wellness rounds," which resulted in suicide attempts, including by Shoffner. (Am. Compl. ¶ 72.) Shoffner states that he engaged in many acts of self-harm, including using a razor. (*Id.* ¶¶ 50, 68–71, 74.) Based on these allegations, it is plausible to infer that Terra was aware of the substantial risk posed by not enforcing security protocols, including the check for tampered-with-razors, and that this indifference caused Shoffner

harm. *See Pressley v. Huber*, 562 F. App'x 67, 69 (3d Cir. 2014) (*per curiam*) ("However, a supervisor may be held individually liable if his failure to properly train a subordinate employee caused a deprivation of the plaintiff's constitutional rights."); *Lapish v. Pa. Dep't of Corr.*, No. 22-2320, 2024 WL 943449, at *3 (E.D. Pa. Mar. 5, 2024) ("A claim of liability based upon a failure to train involves four elements: (1) that an existing policy created an unreasonable risk of constitutional injury; (2) the supervisor was aware of this unreasonable risk; (3) the supervisor was indifferent to the risk; and (4) the injury resulted from the policy or practice." (citation and internal quotation marks omitted)). Accordingly, the Court will deny Terra's Motion to Dismiss the Amended Complaint.

**C. SCI Phoenix's Motion to Dismiss**

Defendants also seek dismissal of all claims against SCI Phoenix. States are not considered "persons" for purposes of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–66 (1989). Furthermore, the Eleventh Amendment bars suits against a state and its agencies in federal court when the state has not waived that immunity, *id.*, and the Commonwealth of Pennsylvania has not waived that immunity, *see* 42 Pa. Cons. Stat. § 8521(b). Since SCI Phoenix is a prison within Pennsylvania's Department of Corrections, it is entitled to Eleventh Amendment immunity and is not a "person" for purposes of § 1983. *Lavia v. Pa., Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (explaining that, "[b]ecause the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity" and is also not considered a person for purposes of § 1983); *see also Pettaway v. SCI Albion*, 487 F. App'x 766, 768 (3d Cir. 2012) (*per curiam*) ("[A]s a state agency and the prison it administers, the Department of Corrections and SCI-Albion are not 'persons' and thus cannot be sued under 42 U.S.C. § 1983."). The Court will

therefore grant the Defendants' Motion and dismiss the claims against SCI Phoenix with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Glushakow and Terra's Motion to Dismiss will be denied, and Clark and Floyd's Motion to Dismiss will be granted as to the First Amendment retaliation claims and denied in all other respects. In addition, SCI Phoenix's Motion to Dismiss will be granted and all claims against SCI Phoenix will be dismissed. An appropriate Order follows.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD KENNEY, J.**